hrk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. 09-40042-JAR |
| ) | |
| **TAMMY T. FRANKLIN and** ) | |
| **DERRICK A. MOORE,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**MEMORANDUM AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on defendants' Motion to Suppress (Doc. 21) all evidence seized as a result of a traffic stop on March 13, 2009, including cocaine and crack cocaine discovered in the red Toyota, any statements made to police afterward, and any testimony regarding the search of the vehicle.[1] A suppression hearing was held September 21, 2009, and testimony was presented. The Court has reviewed the evidence and the parties' submissions and is prepared to rule. For the reasons set forth in detail below, defendants' motion is denied.

**I.    Factual Background**

On March 13, 2009, Trooper Chris Nicholas, an eight and a half year veteran of the Kansas Highway Patrol, was engaged in "road duties" involving routine traffic stops on Interstate 70. While parked in the median on I-70, he saw a red Toyota, driven by a female, followed by a gold Toyota, driven by a male. Neither driver acknowledged Trooper Nicholas's

---

[1] The motion to suppress was filed by defendant Derrick Moore individually. The Court granted defendant Tammy Franklin's request to join in the motion. (Doc. 24.)

presence. Based on his experience and training, he was aware persons transporting drugs often use two vehicles: the vehicle transporting illegal drugs is followed by an "escort vehicle." Furthermore, he knew persons transporting drugs often recruit a female to drive the "loaded vehicle."

Trooper Nicholas followed the two cars and ran the tag numbers on both, noting that both cars had Missouri license tags within two sequential numbers of each another. Trooper Nicholas did a registration check, and both tags came back "not on file." Nicholas testified that he thought the two cars might be rentals from the same area, traveling together. However, if a tag is "not on file," Nicholas testified that it may mean the tag is stolen, the tag is not registered with the state, or the tag belongs to another car.

Nicholas testified that he activated his emergency lights and stopped the red Toyota because its tag did not come back on file. As the gold Toyota drove past, he noticed that the driver appeared to be using a phone. After the red Toyota came to a stop on the shoulder of the road, Trooper Nicholas approached the passenger window. The driver, defendant Tammy Franklin, was holding a cell phone as if she had been speaking on it. The passenger was later identified as defendant Derrick Moore.

Trooper Nicholas asked if the vehicle belonged to them and requested to see its vehicle registration. Defendants informed him it was a rental and gave him the rental papers, from which he learned the car was rented to defendant Franklin. The trooper explained to them that he stopped them because the vehicle's registration did not come back on file. He assured them he did not intend to write them a ticket and requested their drivers' licenses. Defendant Franklin presented a valid Missouri driver's license, and defendant Moore presented a Missouri

identification card. Trooper Nicholas asked where they were driving from, and they stated Denver, Colorado. Trooper Nicholas thought that Franklin and Moore seemed more nervous than usual because they avoided eye contact and stared straight through the front windshield. He again assured them he was not going to write a ticket, but asked them to wait. He returned to his patrol cruiser to look over the rental contract and contact dispatch for a second registration check. He also asked dispatch to do a criminal history check on the occupants.

While waiting for a response from dispatch, Trooper Nicholas signaled the driver, defendant Franklin, back to his cruiser for a few more questions. While seated in the patrol car, Franklin responded to questions, explaining that Moore was just a friend, they were not traveling with anyone else, they had spent one day in Denver visiting a friend, and they were traveling back to St. Louis. Trooper Nicholas testified that she appeared nervous even though he assured her there would be no ticket. She was very talkative and she looked out the window when she spoke. Trooper Nicholas testified that he grew concerned when Franklin volunteered that she left her kids in a hotel while she was traveling to Denver. He again assured her he would not write her a ticket, although he noted it was unusual the vehicle's tag was not "on file."

Trooper Nicholas allowed Franklin to return to her rental car, and asked that she send the passenger back to the cruiser. Defendant Moore walked back to the patrol car and sat in the front seat. Trooper Nicholas asked him if he was living at the address listed on his identification. Defendant Moore stated that he was living in Missouri. In response to questions, Moore said they spent a day or two in Denver visiting Franklin's friend. Trooper Nicholas believed Moore was talkative and animated, but his answers were vague.

After defendant Moore returned to the rental car, dispatch contacted the trooper to inform

3

him the license number was not registered.[2] Trooper Nicholas noted that the vehicle had been rented in St. Louis on March 11th, and that the two defendants were already en route back to St. Louis on March 13th. Nicholas testified that Denver is known for being a "hub" for drugs and St. Louis is known for being a "destination" for drugs. Nicholas noted that the license number listed in the rental papers was the same as the number on the vehicle's tag. At this point, Trooper Nicholas walked up to the passenger window of the rental car, returned the rental agreement and identification papers to the defendants, and told them to have a safe trip.

Trooper Nicholas stepped away from the car and turned toward his cruiser. He testified, however, that he was concerned something illegal was taking place. He turned around toward the car again. Without touching the car or placing his hand on a weapon, he asked in a conversational tone if he could ask the defendants a few more questions. Franklin said yes. He asked if they had been in Denver only one day, and Franklin stated they had. He then asked if anyone else was traveling with them or around them. Franklin said no. He asked if they were carrying anything illegal like guns, explosives, or drugs. Defendants stated they were not.

Trooper Nicholas then asked, "Can I search your car real quick?" Defendant Franklin began to unbuckle her seatbelt and asked if he wanted her to get out of the car. He clarified, "No. I'm asking, can I?" Franklin answered yes.[3] Trooper Nicholas then asked both defendants

---

[2] Although Trooper Nicholas was not certain, he testified at the hearing that one of the defendants may have had a criminal history.

[3] At the suppression hearing, counsel for defendant Moore argued that it was unclear whether Franklin gave express consent to search her rental car, because, on the audio recording of the stop, Franklin cannot be heard to say "yes." Although not all of defendants' responses were captured by the microphone, most of Trooper Nicholas's questions only required a yes or no answer. Therefore, some assumptions can be made. Trooper Nicholas asked in a conversational tone, "Can I search your car real quick?" He clarified, "No, I'm asking, can I?" Defendant Franklin responded, and Trooper Nicholas further clarified, "Is that a yes, then?" Within a second, Trooper Nicholas responded, "Okay," and the defendants stepped out of the rental car.

In her motion to the Court, defendant Franklin does not allege that she withheld consent. Rather, she claims

to wait at the front of the vehicle on the passenger side and asked if either of them had weapons. He asked if he could perform a quick pat down of the defendants to check for weapons.

Master Trooper Brian K. Smith arrived to assist Trooper Nicholas with the search. The two troopers opened the trunk and removed bags. They opened a large bag, removed it from the trunk, then opened a large box and removed it from the trunk. Inside the box, the troopers found a stereo. Trooper Smith lifted the stereo from the box. He noted that it felt unusually heavy and indicated that the screws appeared to have been removed recently.[4] Trooper Smith removed the screws and found four packages that appeared to contain powder and crack cocaine. Trooper Nicholas immediately arrested the defendants and gave them *Miranda* warnings. Defendant Moore stated that he did not understand his rights, but co-defendant Franklin indicated she would speak with officers. She told officers they were traveling with the gold Toyota, as well as a black Nissan. The packages were submitted to the U.S. Drug Enforcement Administration's North Central Laboratory for testing. The packages contained powder and crack cocaine.

The Court reviewed the video recording of the traffic stop. From the moment the red Toyota pulled to the shoulder of the road, until Trooper Nicholas returned their papers and advised them to drive safely, eleven minutes passed. From the moment Trooper Nicholas asked if he might ask a few more questions until the cocaine was discovered, approximately four minutes and twenty seconds passed. The entire duration of the stop, from the initial stop until the arrest, lasted approximately fifteen and a half minutes.

---

that her consent was not sufficiently attenuated from the unlawful seizure to be voluntary. Therefore, under the totality of the circumstances, the Court concludes that, in the dialogue that took place at the passenger window, defendant Franklin gave consent to search the vehicle. Whether that consent was voluntary will be addressed in the Court's analysis.

[4]Trooper Nicholas testified that there were "tooling marks" around the screws that gave the appearance that the screws had been removed and reinserted multiple times.

On May 13, 2009, both defendants were indicted on two counts of knowingly and intentionally possessing a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), with reference to 21 U.S.C. § 841(b)(1)(A) and 18 U.S.C. § 2.

**II.     Discussion**

Defendants jointly move to suppress the evidence discovered, alleging that the stop was not justified at its inception, the scope and duration of the stop exceeded its initial purpose, and any subsequent consent given by defendant Franklin was tainted by the illegal seizure. The government opposes the motion, claiming defendant Moore does not have standing to contest the search. Furthermore, the initial detention was justified by a reasonable suspicion that defendants were operating the car in violation of K.S.A. § 8-127. The government also argues the detention was no longer than necessary to achieve the purposes of the stop, and the search was conducted only after defendant Franklin gave voluntary consent.

Under the Fourth Amendment, a traffic stop is a "seizure" which is reasonable only if (1) the officer's action was "justified at its inception," and (2) it was "reasonably related in scope to the circumstances which justified the interference in the first place."[5]

*A.     Initial Stop*

Tenth Circuit cases establish that, before stopping an automobile, an officer must have "an objectively reasonable articulable suspicion" to believe a violation of any "applicable traffic or equipment regulation[]" has occurred or is occurring.[6] Reasonable suspicion may be

---

[5]*Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

[6]*United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir. 2004) (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)); *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

6

supported by an "objectively reasonable" good faith belief even if premised on factual error.[7] The subjective motives of the officer and the practices of his department are irrelevant in deciding whether a particular stop is reasonable.[8] The Tenth Circuit has stated, "we rightly leave to the state legislatures the task of determining what the traffic laws ought to be, and how those laws ought to be enforced."[9]

Trooper Nicholas testified that he asked dispatch to run a registration check on defendants' vehicle tags, and dispatch reported back that the vehicle tag was not on file. He suspected the vehicle was not registered, and stopped the defendants for violating K.S.A. § 8-127, which requires that every owner of a motor vehicle, before any such vehicle is operated in the state, to apply for and obtain registration in Kansas, except as otherwise provided.[10] The statute applies to persons "whether such owner is a resident of this state or another state, or such motor vehicle . . . is based in this state or another state . . . ."[11] Violation of this provision is a misdemeanor offense.[12] Although the government neglected to discuss the reciprocity statute, § 8-138a provides an exception to § 8-127 for nonresidents operating vehicles in Kansas, but only if they are "duly licensed in [their] state of residence," and only to the extent Kansas residents

---

[7] *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[8] *Whren v. United States*, 517 U.S. 806, 815 (1996).

[9] *Botero-Ospina*, 71 F.3d at 788.

[10] K.S.A. § 8-127(a); *United States v. Vo*, Case No. 06-10116, 2006 WL 2850301, *9 (D. Kan. Oct. 4, 2006).

[11] K.S.A. § 8-127(a).

[12] K.S.A. § 8-149.

7

receive reciprocal privileges.[13]

To determine whether the vehicle was "duly licensed" under Missouri law, sufficient to satisfy Kansas' reciprocity statute, the Court must analyze Missouri law. Missouri grants reciprocal rights to Kansas drivers to use Missouri roads, but "only to the extent that . . . substantially equivalent exemptions are granted to residents of Missouri for the operation of vehicles *duly registered* in Missouri."[14] Missouri permits nonresident drivers to operate vehicles within the state so long as the vehicle has been "duly registered" in the owner's state of residence and "at all times" has displayed "the number plate issued for the vehicle in the place of residence of such owner."[15] Therefore, under Kansas' reciprocity statute, a Missouri vehicle may operate on Kansas highways so long as it is "duly licensed" in Missouri.[16] Furthermore, the Missouri registration requirements are similar to Kansas'. Missouri law requires that "[e]very owner of a motor vehicle . . . which shall be operated or driven upon the highways of this state, . . . shall annually file . . . in the office of the director of revenue, an application for registration . . . ."[17] Violation of the statute is a class B misdemeanor.[18]

To be "duly licensed" per Kansas law, a nonresident vehicle must be "duly licensed"

---

[13] K.S.A. § 8-138a; *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 821 (10th Cir. 2007). The Tenth Circuit has noted that a stop is lawful if an "objectively valid basis for carrying out the seizure exists, even if the ground cited by the officer for justifying the stop is unconstitutional." *United States v. Ramstad*, 308 F.3d at 1145 n.3 (10th Cir. 2002).

[14] Mo. Rev. Stat. § 301.271(1) (emphasis added).

[15] § 301.271(1).

[16] K.S.A. § 8-138a.

[17] Mo. Rev. Stat. § 301.020.

[18] § 301.020(6).

under its state of residence.[19]  The Tenth Circuit has found, under the Kansas reciprocity statute, that a nonresident owner of a vehicle, operating such vehicle on Kansas highways, is not operating a "duly licensed" vehicle if the license plate is displayed in a manner that violates the laws of the owner's state of residence.[20]  In *State v. Hayes*,[21] the Kansas Court of Appeals permitted a Kansas officer to enforce Kansas' "clearly visible" statute on an Indiana driver, noting that Indiana had an identical law.  The court explained the importance of out-of-state vehicles complying with motor vehicle laws in Kansas which are identical to those in their state of residence:

> Law enforcement officials frequently must determine from tag numbers whether a vehicle is stolen; whether it is properly registered; or whether its occupant is suspected of a crime, is the subject of a warrant, or is thought to be armed.  Out-of-state cars on Kansas highways are subject to the same police imperative as local vehicles.[22]

Such law enforcement efforts presuppose the vehicle is registered, even if not with the State of Kansas.  By logical extension, the Missouri directive to register vehicles with the office of the director of revenue is intended to permit officers to enforce laws wherever that vehicle may venture.  Thus, a Kansas officer may expect a vehicle "duly licensed" in another state, to be registered according to the laws of that state as well.[23]

---

[19]K.S.A. § 8-138a.

[20]*United States v. Ramstad*, 308 F.3d 1139, 1145-46 (10th Cir. 2002) ("[E]very decision by a Kansas court that has considered § 8-138a has assumed or held that the section requires that out-of-state vehicles be properly licensed in their home state").

[21]660 P.2d 1387, 1389 (Kan. Ct. App. 1983).

[22]*Id.*

[23]*See State v. Wakole*, 959 P.2d 882 (Kan. 1998) (holding that a nonresident vehicle operating on Kansas highways was "duly licensed" per K.S.A. § 8-138a because the owner's state of residence (Oklahoma) recognized cars licensed and registered under Sac and Fox tribal law).

In the present case, the evidence shows that Trooper Nicholas had an objectively reasonable suspicion that defendants' tag violated K.S.A. § 8-127, even though defendant Franklin was able to provide him with rental information during the course of the stop. Before stopping defendants, Trooper Nicholas ran a vehicle registration check on the red Toyota, but the vehicle's tag was not on file. Even though the car had Missouri license plates, the vehicle did not appear to be "duly licensed" in its state of residence, because Missouri law also requires registration of motor vehicles.[24] Thus, Trooper Nicholas had a reasonable articulable suspicion that the occupants were operating the car in violation of K.S.A. § 8-127. On this basis, the initial stop was justified at its inception.

### B.   *Length of the Detention*

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place."[25] "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[26] However, in the course of a routine traffic stop, an officer may "request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation."[27] An officer may also run a simultaneous

---

[24] Mo. Rev. Stat. § 301.020.

[25] *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[26] *United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[27] *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

check of the detainees' criminal history.[28] Thereafter, "when a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning."[29] Under Supreme Court precedent, "the subjective intentions of the officer [do] not make the continued detention of respondent illegal under the Fourth Amendment. . . . as long as the circumstances, viewed objectively, justify that action."[30]

In this case, there is no evidence that the stop was prolonged beyond what was necessary to effectuate the purpose of the stop. Applying K.S.A. § 8-127 and 8-13a objectively, Trooper Nicholas was permitted to ask for vehicle registration papers and identification. He was also justified in running another registration check and simultaneously running a criminal background check of the occupants. Although he took the opportunity to ask the defendants a few more questions, he did so only while awaiting a response from dispatch. "[T]he content of police questions during a lawful detention does not implicate the Fourth Amendment as long as those questions do not prolong the detention."[31] Trooper Nicholas testified that as soon as he heard back from dispatch regarding the vehicle registration and criminal background checks, he

---

[28]*United States v. McRae*, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996).

[29]*Patten*, 183 F.3d at 1193 (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)).

[30]*Ohio v. Robinette*, 519 U.S. 33, 38 (1996) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). The Sixth Circuit has clearly held that, under this precedent, "continuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation." *United States v. Garrido*, 467 F.3d 971, 978 (6th Cir. 2006) (quoting *United State v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003)); *United States v. Bohanon*, 629 F. Supp. 2d 802 (E.D. Tenn. 2009) (finding that, when viewing the relevant traffic violation objectively, the scope and duration of the seizure was not illegal even though police officer immediately assured driver "I'm not going to write you a ticket or anything," and proceeded to ask questions and run a check).

[31]*United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007) (citing *Muehler v. Mena*, 544 U.S. 93, 101 (2005)).

returned defendants' documents.[32] After returning all papers, he advised the defendants to drive safely. The entire length of the stop, from the moment they pulled to the side of the road until he returned their papers, was approximately eleven minutes.

Defendants cite to *United States v. McSwain*[33] as authority in this context. The Court finds the case is distinguishable on its facts. In *McSwain*, the trooper stopped a driver "for the sole purpose" of determining whether his temporary registration ticket was valid.[34] The Tenth Circuit held that when the trooper approached the vehicle and discovered the tag was valid and had not expired, the purpose of the stop was satisfied and further detention to inquire into travel plans or request license and registration, was unreasonable.[35] In *McSwain*, the trooper discovered that the driver had not violated the law in question.

Here, Trooper Nicholas believed the vehicle was not properly registered. Therefore, he approached the vehicle to inquire into its ownership. Under K.S.A. § 8-127, even a nonresident vehicle must be "duly licensed" in its state of residence to be operated on Kansas highways. Having received the rental agreement and identification of the occupants, Trooper Nicholas was

---

[32]During the suppression hearing, counsel for defendant Moore argued that the second registration check was unnecessary and duplicitous as it only confirmed the results of the first registration check done *before* the traffic stop. Even though the second check produced no different results than the first, the Court declines to prevent officers from conducting a registration check *after* a vehicle has been stopped lawfully and the occupants have produced personal identification. Such stringent limits would hinder an officer's ability to enforce K.S.A. § 8-127 or to verify the information he or she receives from persons claiming lawful possession of an unregistered vehicle.

During the hearing, defense counsel also examined Trooper Nicholas regarding his ability to see colors and shapes at various distances. This line of questioning reinforces the reasonableness of doing a second registration check after a vehicle is stopped to ensure that the first check included the correct numbers. As noted earlier, if Trooper Nicholas's *Terry* stop was based on an objective good faith belief that a regulation was being violated, the initial stop was justified even if premised on factual error. *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[33]29 F.3d 558 (10th Cir. 1994).

[34]*Id.* at 561.

[35]*Id.*

justified in verifying the accuracy of the information they provided.

An officer who stops a driver for violating "any one of the multitude of applicable traffic and equipment regulations of the jurisdiction" may request identification and run a registration check.[36] In this case, a registration check was even more relevant to the purpose of the stop because Trooper Nicholas suspected the occupants were violating the law *requiring* all vehicles operating on Kansas roads to be "duly licensed." Finally, Trooper Nicholas testified that the length of the stop did not exceed the time necessary to effectuate that check. The trooper in *McSwain* sought to determine if the driver's registration sticker was valid and current, but Trooper Nicholas sought to determine whether the defendant's vehicle had been registered at all. In *McSwain*, the trooper's "reasonable suspicion regarding the validity of McSwain's temporary registration sticker was completely dispelled *prior* to the time he questioned Mr. McSwain and requested documentation."[37] Here, however, further inquiry into the registration of the vehicle was within the scope of the initial stop. Because this difference is integral to the Tenth Circuit's holding, the Court declines to follow *McSwain* in this context.

Next, defendants cite *United States v. Valadez*,[38] a decision of the Fifth Circuit in which the trooper stopped a driver on the highway for what appeared to be an expired vehicle tag and illegal tinting on his windows.[39] The court held that when the trooper discovered the tag was valid and the tinting was legal, further detention for questioning and background checks were

---

[36]*United States v. Ramstad*, 308 F.3d 1139, 1144 (10th Cir. 2002) (*quoting United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999)).

[37]*McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) (emphasis in original).

[38]267 F.3d 395 (5th Cir. 2001).

[39]*Id.* at 396.

13

beyond the scope of the stop.⁴⁰  Again, for the reasons stated above, the Court finds that the Fifth Circuit's analysis is not persuasive in this context.  Unlike the troopers in the prior two cases, Trooper Nicholas had an ongoing "reasonable articulable suspicion" that the defendant's vehicle had not been properly registered as required by K.S.A. § 8-127 and 8-138a.  During the registration check, the trooper was permitted to ask the defendants questions regarding travel plans.  According to Trooper Nicholas's testimony, as soon as he got a response from dispatch, he returned defendants' documents and advised them to travel safely.  The entire length of the stop, from the moment defendants pulled to the side of the road until Trooper Nicholas returned their papers, was approximately eleven minutes.  Under the totality of the circumstances, the Court finds that the length of the detention was within the scope of the initial stop and reasonable under the Fourth Amendment.

    C.    *Consent*

After the purpose of a traffic stop is complete, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible.⁴¹  In general, prolonging the detention for further questioning unrelated to the initial traffic stop is permissible only if: "(1) during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity'; or (2) 'the driver voluntarily consents to the officer's additional questioning.'"⁴²

"A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if

---

⁴⁰*Id.* at 398.

⁴¹*United States v. Bradford*, 423 F.3d 1149, 1156-57 (10th Cir. 2005).

⁴²*United States v. Elliot*, 107 F.3d 810, 813 (10th Cir. 1997) (quoting *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994); *United States v. Cervine*, 347 F.3d 865, 868-69 (10th Cir. 2003).

the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."[43] The Tenth Circuit follows a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned."[44] The court has explained,

> The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual. A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's documentation so long as a reasonable person under the circumstances would believe [they] were free to leave or disregard the officers request for information.[45]

Under Tenth Circuit precedent, in order to prove the consent to search was voluntary, the government must show the following: "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely give; and (2) The government must prove consent was given without duress or coercion, express or implied."[46]

Considering the totality of the circumstances, the Court finds that defendant's detention was transformed into a consensual encounter when Trooper Nicholas returned defendants' paperwork and told them to "drive safely."[47] An encounter does not become non-consensual merely because an officer fails to advise a driver that he was free to go.[48] Neither Trooper

---

[43] *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

[44] *Bradford*, 423 F.3d at 1158.

[45] *Id.* (internal quotations and citations omitted).

[46] *United States v. D'Armond*, 80 F. Supp. 2d 1157, 1165 (D. Kan. 1999) (quoting *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992)).

[47] *United States v. Ledesma,* 447 F.3d 1307, 1315 (10th Cir. 2006) ("Phrases like 'thank you' and 'have a safe one' signal the end of an encounter, and afford a defendant an opportunity to depart.").

[48] *See, e.g., United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006) (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)); *Bradford*, 423 F.3d at 1158.

Nicholas's testimony, nor the video of the stop, supports the finding that Trooper Nicholas made any "coercive show of authority" such that a reasonable person would not have felt free to leave.[49] There is no evidence that the trooper used any force throughout the encounter, brandished his weapon, made any threats or commands, or physically touched defendant. Therefore, the Court finds that Franklin's consent to the search was voluntarily given and was not obtained in violation of the Fourth Amendment.

### D. *Scope of Consent*

Although the parties did not raise the issue in their briefs, defense counsel noted at the suppression hearing that Trooper Nicholas only asked to conduct a "quick search." The scope of the search is limited by the breadth of the consent given.[50] The scope of the consent is measured objectively, by determining "what would the typical reasonable person have understood by the exchange between the officer and the suspect."[51] In various cases, the Tenth Circuit has found the suspect authorized a general search of his vehicle when he consented to an officer's request to "look in" or "look through" the suspect's car, thus permitting an officer to open containers in the car.[52] However, the suspect's consent is limited if the officer makes additional statements or

---

[49]*United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991) (discussing factors for finding a "coercive show of authority").

[50]*United State v. Elliott*, 107 F.3d 810, 814-15 (10th Cir. 1997).

[51]*Id.* at 815.

[52]*Id.* (noting that an officer's request to "look through the trunk," "look in his car," or similar wording "has typically been construed to allow full searches of automobiles") (collecting cases); *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994) ("While a person giving consent to a search may limit the area to be searched, a general consent to search includes closed containers within the vehicle, . . . and this court has specifically ruled that a failure to object to the continuation of a search indicates that the search was conducted within the scope of the consent given.") (citing *Florida v. Jimeno*, 500 U.S. 248 (1991); *United States v. Nicholson*, 17 F.3d 1294 (10th Cir. 1994)).

express assurances indicating an intent to limit the scope of the officer's request.[53]

Here, Trooper Nicholas requested to do a "quick search" of the car. His request was not limited by any assurances. Furthermore, the defendants were permitted to watch the search from a distance, but never withdrew their consent.[54] Although the troopers opened various containers in the trunk of the car, the search only lasted four minutes and twenty seconds. Under the totality of the circumstances, the trooper's search of the vehicle did not exceed the scope of his request or the consent given by the defendants.

### E. Defendant Moore's Standing

Finally, the Government argues that defendant Moore does not have standing to contest the search of the car rented by defendant Franklin. Defendant Moore did not respond to this argument. At the suppression hearing, Trooper Nicholas testified that defendant Moore was a passenger, while the car was rented to the driver, defendant Franklin. Trooper Nicholas also testified that Moore never asked to leave the scene of the search, and if he had asked to leave, the troopers would not have permitted him to leave with the vehicle.

Under *Brendlin v. California*,[55] a passenger of a vehicle subject to a traffic stop has standing to challenge the initial stop, his own seizure, and any evidence derived from that

---

[53]*See id.* at 815-16 (noting that the officer limited the permissible scope of his search when he assured the suspect that he did not want "to look through each item," but only to see how things were "packed.").

[54]*See United States v. McRae*, 81 F.3d 1528, 1538 (10th Cir. 1996) ("[f]ailure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent") (quoting *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994); *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986)); *United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995) ("where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle").

[55]551 U.S. 249 (2007).

17

seizure.[56] It does not follow that a passenger has standing to contest the search of the vehicle itself when that person lacks a possessory or property interest in the vehicle.[57] Thus, a passenger-defendant "must first establish that the detention did violate his Fourth Amendment rights."[58] Next, defendant must show a factual nexus, or "but for" causation, demonstrating "that the evidence sought to be suppressed is a product of *his* or *her* unlawful detention."[59] "[A]t a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[60] After defendant makes these two showings, the burden shifts to the government to show the evidence "would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint."[61]

Defendant Moore has produced no evidence showing that his detention was illegal. Based on the analysis above, the stop and subsequent detention were justified under *Terry v. Ohio*, and defendant Franklin's consent to the search was voluntary. Thus, Moore's detention was not unlawful. Assuming he was unlawfully detained, Moore did not request permission or otherwise attempt to depart the scene. Because Officer Nicholas searched the vehicle on the basis of defendant Franklin's consent, any request by defendant Moore to leave with the vehicle would have been denied. Finally, if defendant Moore had walked away from the scene of the

---

[56]*Id.* at 257; *see also United States v. Martinez*, 537 F. Supp. 2d 1153, 1156 (10th Cir. 2008).

[57]*United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007).

[58]*United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir.), *cert. denied*, 531 U.S. 887 (2000).

[59]*United States v. DeLuca*, 269 F.3d 1128, 1134-35 (10th Cir. 2001) (emphasis added).

[60]*Nava-Ramirez*, 210 F.3d at 1131.

[61]*United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).

search, the evidence of the drugs would have been found.  Therefore, the Court finds that defendant Moore does not have standing to contest the search in this case.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motion to suppress (Doc. 21) is **DENIED**.

Dated:  October 15, 2009

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE